*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L. SLACK, Minor.

UNPUBLISHED
September 5, 2024

No. 367199
Genesee Circuit Court
Family Division
LC No. 22-138590-NA

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Respondent-mother ("mother") appeals as of right the trial court's order terminating her parental rights to the minor child, LS, under MCL 712A.19b(3)(b)(*i*) (parental rights to sibling terminated due to serious and chronic neglect or abuse) and (j) (reasonable likelihood of harm if returned to parent).[1] We affirm.

## I. FACTUAL BACKGROUND

Children's Protective Services (CPS) and Department of Health and Human Services (DHHS) became heavily involved in mother's life in 2010, largely due to mother's substance abuse and domestic violence issues. Her parental rights to her first child were terminated in 2013 as a result of her failure to comply with court-ordered services to rectify those issues. Mother's second child was born positive for opiates in 2014 and was removed from her custody in 2016, again due to substance abuse and domestic violence issues. In December 2022, DHHS petitioned to remove LS from mother's care and terminate her parental rights at the initial disposition. The petition noted that mother's parental rights to one of LS's siblings had previously been terminated and that she had failed to rectify the issues that led to the previous termination. The petition alleged that while mother and LS were staying at Odyssey House, a sober living facility, two-year-old LS used mother's vape pen and drank two individually wrapped alcohol shots. For reasons not specified in the record, neither mother nor employees of the facility sought medical attention for LS. The petition also alleged that mother screamed at LS, slapped her and told her to "shut up." Following

---

[1] LS's father, James Slack, passed away prior to the start of the child protective proceedings in this case.

a preliminary hearing, the trial court authorized the petition, and LS was placed in the care of her paternal uncle.

Mother pleaded no contest to jurisdiction on June 1, 2023, in lieu of an adjudication trial. Mother stated that she understood that DHHS had requested termination of her parental rights at the initial disposition and that she was still entitled to a hearing regarding termination, at which DHHS was required to prove one or more statutory bases for termination by clear and convincing evidence and that termination was in LS's best interests by a preponderance of the evidence. Mother further stated she understood that if DHHS withdrew its termination request for any reason, services would be ordered by the court. All of the parties agreed to the court using "the sworn petition as the basis for the plea," and, after reviewing the petition again, the court found that the petition contained a sufficient basis for the plea.

An initial dispositional hearing was held over two days in June and July 2023. Because DHHS petitioned for termination at the initial disposition, the initial dispositional hearing simultaneously acted as a termination hearing. Ms. Gravis, the foster care worker and Ms. Harrison, the CPS investigator, both testified regarding mother's substance abuse history. Mr. Shoup, the father of BS,[2] and Mr. Richard Slack,[3] ["Richard"] LS's paternal uncle in whose home LS was placed, testified at the hearing. Both attested that mother had heavily abused substances for over a decade and that she was still abusing substances at the time of the initial disposition hearing. According to Mr. Shoup, mother was given parenting time with BS but had failed to consistently attend. He believed mother had been under the influence during some of her parenting time visits with BS. When the hearing took place, he estimated that it had been "about a year" since mother last saw BS. Mr. Shoup also claimed that he had a video showing mother "shooting up" heroin within six months of LS's trial. He conceded, however, that he had merely received the video from an unidentified acquaintance and that he had no way of actually knowing whether mother was using heroin in the video. He testified, however, that heroin was her "drug of choice" and he could see her injecting it into her vein and then falling asleep, which is typical of heroin use. Mr. Shoup also believed he recognized LS as the child running around in the video because he recognized her voice.

Richard, LS's uncle and current placement, testified that LS was doing well in his care. He testified that mother had less than ten supervised parenting time visits with LS over the course of the termination proceedings, which had been ongoing for approximately six months at that point. Richard attested that during visits, mother would try to play and interact with LS, and LS would be excited to see mother. He observed that LS was not always interested in interacting with mother, but noted that LS is only three years old and is frequently more interested in her toys than the people around her. Often LS would play with the toys that mother brought to the visit, but not play with mother, so mother would just play alongside LS. He also noted that mother had attended some video visits with LS, but indicated that LS was likely too young to interact with mother via video. Richard believed that termination was in LS's best interests based on mother's inability to

---

[2] BS is mother's second child. BS was born opiate positive and placed with his father, Mr. Shoup, when he was two years old.

[3] Richard Slack is brother to James Slack, LS's deceased father.

remain sober and his fear that mother, like LS's father, would die from an overdose of drugs given her history of substance abuse. Richard also testified that he would be willing to permanently adopt LS.

Ms. Gravis, the foster care worker, testified that mother had been in and out of rehabilitation facilities for substance abuse, but that she appeared to be trying to maintain her connection with LS. Supervised parenting time visits with LS were scheduled every Monday, Tuesday, and Friday. Ms. Gravis explained that mother missed a number of visits because the foster care worker could not get in contact with the substance abuse facility where mother was staying, and mother failed to text the worker 24 hours in advance of the visit to confirm that she was going to attend. Only a few visits were missed because mother or LS was sick. At one point, mother was in an inpatient rehabilitation facility where virtual visits were not allowed.[4] Ms. Gravis testified that LS was bonded with her Uncle Richard and his partner. She further testified that termination would be in LS's best interests because mother could not provide permanency or stability in a reasonable amount of time.

Ms. Harrison, the CPS investigator, testified that mother's oldest child, JN, was brought into care due to concerns regarding physical abuse, substance abuse, and domestic violence. Mother's parental rights to JN were terminated in 2013. Mother's second child, BS, was also removed due to substance abuse issues when he was two years old. He was thereafter placed with Mr. Shoup. Ms. Harrison testified that mother's substance abuse was consistent throughout all three cases. Mother was offered services for substance abuse, mental health, and parenting skills in 2010, 2011, 2012, 2014, and 2016.[5] LS eventually came to CPS's attention because she found and used alcohol and a vape pen that were in mother's possession at a drug rehabilitation facility. Allegations had also been made that mother was slapping and yelling at LS at the facility. The petition for termination of mother's parental rights was filed as a result of these incidents. Ms. Harrison testified that mother continued to struggle with maintaining sobriety and recommended that her parental rights be terminated.

Ms. Auger, mother's grandmother, testified that mother and LS shared a bond with each other. Mother lived with grandmother when LS was approximately a year old, and grandmother testified that mother took care of all of LS's needs without help. She had observed mother caring for LS, including comforting her and providing for her by cooking meals and grocery shopping. Grandmother testified that LS was always "huggy [and] happy" to see mother. Grandmother believed that mother and LS had a good relationship, and that "when she's not on drugs, she's a

---

[4] Ms. Gravis detailed approximately 45 visits that were scheduled between January 23, 2023 and June 23, 2023. Mother attended approximately 13 virtually and two in person. Mother's last in-person parenting times with LS were March 13 and 14, 2023. All others were missed for various reasons, including June 8, 2023, when mother wanted to meet in person rather than virtually but made no request or plans with Ms. Gravis ahead of time to achieve that goal.

[5] Ms. Harrison testified that mother had multiple CPS investigations starting in August 2010, August 2011, January 2012, March 2014 and February 2016 and all involved substance abuse. The only time when there were no CPS investigations was between 2016 and 2020, when mother had no children in her home.

very good mother." Ms. Auger also testified, however, that she did not recognize that mother had a history of substance abuse dating back to 2011, she was unaware that mother lost her rights to JN due to substance abuse, and was unaware of multiple 911 calls related to mother overdosing between June and September 2022.

Rebecca Wertman, the clinical director for Bear River House, a rehabilitation facility where mother had received treatment, testified for mother. She stated that mother was at the facility from April 6, 2023 to June 5, 2023. Mother attended group and individual therapy sessions while in treatment. Mother was engaged in all of her therapy sessions and had never missed a session. Ms. Wertman testified that she facilitated parenting time between mother and LS via Zoom. She testified that mother's engagement with LS was appropriate and that she did her best to interact with LS despite the difficulties of visiting with such a young child via Zoom. The director further testified that she did not have direct access to any drug screening results because the medical aspect of the facility was separate from the treatment and counseling aspect. However, Ms. Wertman noted that if mother had tested positive during her stay at the facility, it would have been brought to the director's attention. Ms. Wertman noted that to her knowledge, mother had remained sober throughout treatment, successfully completed the program, and was discharged to a sober living facility. She had no major concerns about mother's ability to maintain her sobriety, and testified that she believed "a person can parent even through addiction if they are receiving the appropriate support." Ms. Wertman recommended that mother transfer to sober living and stay there for the length of the treatment, obtain a sponsor or treatment coach, and attend classes. She was unaware, however, that mother had left the sober living program after only a few weeks. Ms. Wertman was also aware of the treatment mother had been offered in the past[6] but believed that mother was now ready to change.

Ms. Gravis testified as a rebuttal witness on the second day of trial. She stated that mother had been asked to leave her sober living facility on June 26, 2023, because she was using substances. At the time of trial, it was unknown what substances she was using and no drug screens were available to present to the court. Ms. Gravis also had no information regarding where mother was living.

---

[6] Ms. Wertman acknowledged that during mother's involvement with CPS and DHHS, mother received services from "Families First, Outreach counseling, home based parenting education, advanced impact outreach counseling, substance abuse screening, Smithly (sic) drug testing services, parenting skills, Michigan Works, alcohol drug administrative monitoring, substance abuse treatment, Foote Memorial Hospital for substance abuse treatment, Allegiance Health for substance abuse treatment, MG Mark substance abuse screening, Sacred Heart, Lloyd Human Services, Professional Counseling Services, family reunification program, the YWCA in Bay County, the MPA Group for counseling services, part of the DH[HS] referred preventative services, including drug exposed infant, maltreatment, physical abuse, physical neglect, substance abuse, and threatened harm, the Michigan Psych Association Absolute Care Services, Saginaw Psychological Services, [and] Saint Vincent Home Services."

At the close of testimony, the trial court found that the court had jurisdiction over LS pursuant to MCL 712A.19b(3), and that statutory grounds for termination pursuant to MCL 712A.19b(3)(b)(*i*) and (3)(j) had been proven by clear and convincing evidence, noting mother's extensive history of substance abuse, failure to benefit from services to address her substance abuse and domestic violence issues, and prior termination of her parental rights to her first child.[7] Regarding MCL 712A.19b(3)(b)(*i*), the trial court stated:

> There is a long history of [substance abuse] being a constant problem. It's clear that that's why mom's rights to an older child were terminated at that point in time.
>
> And there is no indication at this point—I mean, I appreciate that mom put in the work at Bear River. It appears to be—it appears from [the director]'s testimony that she put in a significant amount of work at Bear River and that things were going well there.
>
> But it's not sufficient . . . and, to me, at this point in time, I think the agency has shown by clear and convincing evidence that they have met ground [(3)(b)(*i*)], because she continues to fail to rectify the conditions.
>
> There appears to be still an ongoing substance abuse issue or some kind of issues. She appears to have been kicked out of the sobri—sober living at this point.
>
> We don't know if she has appropriate housing or not. It appears to be continuing to influence her abilities to be a safe and sober parent for [LS]. So I'm going to find that the agency provided clear and convincing evidence as to ground [(3)(b)(*i*)].

Regarding MCL 712A.19b(3)(j), the trial court stated:

> [G]round [(3)(j)], it says there is a reasonable likelihood, based on the conduct or capacity of the child's parent that the child will be harmed if he or she is returned to the home with the parent.
>
> The Court would consider all of the prior testimony that the Court placed on the record and apply those same arguments to this as well.
>
> But the Court will indicate that there was—and I want to be really careful in placing on the record here what I'm considering because I do think that there was some testimony regarding some type of incident of [LS] getting into items at Odyssey House.

---

[7] DHHS sought termination under MCL 712A.19b(3)(g) as well, but the court concluded that DHHS had failed to establish this statutory ground for termination.

However, there was no one who testified as to that that witnessed it personally. And I do think we're treading into hearsay testimony.

The court went on to opine that mother had been in and out of several rehabilitation facilities but had failed to show that she could maintain her sobriety. It concluded that DHHS had established that termination was appropriate under MCL 712A.19b(3)(j).

The trial court further opined that termination was in LS's best interests based on mother's continued substance abuse. The court did not address whether a bond existed between LS and mother, and only noted that a bond appeared to exist between LS and her foster family. The court further observed that LS's foster family was willing to adopt her, and that LS's Uncle Richard "was not looking for a guardianship or anything else." The court thus concluded that termination was appropriate.

At the conclusion of the dispositional hearings on June 28 and July 19, 2023, the court found that DHHS was not required to make reasonable efforts toward reunification because, as supported by facts contained in the petition, mother had a prior involuntary termination due to substance abuse that qualified as aggravated circumstances per MCL 722.638(1)(b)(i):

> [T]he Court is going to find that there is an aggravated circumstance present due to the prior termination and the lack of recti—that there has been no rectifying of that condition—of that prior—of the conditions that brought that prior termination to the table, which i.e., the substance abuse issue. So I do find that there is an aggravated circumstance in this case, pursuant to the statute. And the Court—so, therefore, the agency was not required to provide reasonable efforts at this point in time.
>
> But the Court would note that seven or eight months has passed since CPS first became aware of [LS] and there has been adequate time for mom to engage in services and to engage in whatever it is she needed to do to become sober. And despite her success at Bear River, it appears that it has not been long term successful at this point in time. That there still seems to be issues, there still seems to be a lack of consistent sobriety, and I don't know how long a three and a half year old is supposed to wait. There needs to be permanency for her.

Following the hearing, the trial court issued an order terminating mother's parental rights to LS. This appeal followed.

## II. ANALYSIS

Mother argues that the trial court erred by terminating her parental rights at initial disposition on several grounds. First, mother argues that the trial court erred by not articulating aggravated circumstances to support termination of her parental rights at the initial dispositional hearing and that DHHS failed to make reasonable efforts toward reunification absent a judicial determination of an aggravated circumstance, thereby violating her due-process rights. Next, mother argues that the trial court erred by finding that statutory grounds for termination pursuant to MCL 712A.19b(3)(b)(*i*) and (j) had been proven by clear and convincing evidence. Lastly,

mother argues that the trial court erred by finding by a preponderance of the evidence that termination was in LS's best interests. We disagree with mother.

## A. STANDARDS OF REVIEW

This Court reviews "for clear error a trial court's decision regarding reasonable efforts." *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021); *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). This Court also reviews for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence and that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A finding is clearly erroneous if, even if some evidence supports the finding, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*. at 41. This Court gives deference to "the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted).

## B. REASONABLE EFFORTS AND AGGRAVATED CIRCUMSTANCES

"A natural parent has a fundamental liberty interest in the care, custody, and management of his [or her] child that is protected by the Fourteenth Amendment of the United States Constitution . . . and by article 1, § 17, of the Michigan Constitution[.]" *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.) (quotation marks and citations omitted). Absent certain exceptions, reasonable efforts toward reunification of the family must be made unless:

> (a) There is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638.[8]

---

[8] MCL 722.638 provides in relevant part:

> (1) The department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, if 1 or more of the following apply:
>
> \* \* \*
>
> (b) The department determines that there is risk of harm, child abuse, or child neglect to the child and either of the following is true:
>
> (*i*) The parent's rights to another child were terminated as a result of proceedings under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, or

* * *

     (c) The parent has had rights to the child's siblings involuntarily terminated and the parent has failed to rectify the conditions that led to that termination of parental rights. [MCL 712A.19a.]

Accordingly, DHHS need not make reasonable efforts "when a parent has his or her parental rights involuntarily terminated to a sibling of the child at issue and the parent has failed to rectify the conditions that led to that earlier termination of parental rights." *Sanborn*, 337 Mich App at 260.

If a petition to terminate parental rights is filed, a trial court "may enter an order terminating parental rights under [MCL 712A.19b(3)] at the initial dispositional hearing." MCL 712A.19b(4). See also *In re Sanders*, 495 Mich 394, 406; 852 NW2d 524 (2014). MCR 3.977(E) governs the termination of parental rights at the initial dispositional hearing, and it states:

     The court shall order termination of the parental rights of a respondent at the initial dispositional hearing held pursuant to MCR 3.973, and shall order that additional efforts for reunification of the child with the respondent shall not be made, if

     (1) the original, or amended, petition contains a request for termination;

     (2) at the trial or plea proceedings, the trier of fact finds by a preponderance of the evidence that one or more of the grounds for assumption of jurisdiction over the child under MCL 712A.2(b) have been established;

     (3) at the initial disposition hearing, the court finds on the basis of clear and convincing legally admissible evidence that had been introduced at the trial or plea proceedings, or that is introduced at the dispositional hearing, that one or more facts alleged in the petition:

     (a) are true, and

     (b) establish grounds for termination of parental rights under MCL 712A.19b(3)(a), (b), (d), (e), (f), (g), (h), (i), (j), (k), (l), or (m);

     (4) termination of parental rights is in the child's best interests.

In this case, DHHS sought termination of mother's parental rights at initial disposition in its original petition pursuant to MCL 712A.19a. See MCR 3.977(E)(1). At the adjudication hearing, all of the parties agreed to the trial court relying on the petition as the basis for mother's no-contest plea, which indicated that mother's parental rights to her first child had been involuntarily terminated in 2013 as a result of mother's failure to complete court-ordered services

_____

a similar law of another state and the parent has failed to rectify the conditions that led to the prior termination of parental rights.

to rectify her substance abuse and domestic violence issues. After reviewing the petition once more, the trial court found that the petition contained sufficient grounds to assume jurisdiction. See MCR 3.977(E)(2). Moreover, at the initial dispositional hearing, the trial court reiterated that the circumstance that primarily led to the termination of mother's parental rights to her first child was substance abuse, and it found that mother had failed to rectify the issue. The court's statements clearly indicate that it found that reasonable efforts were not required because mother's parental rights to a sibling of LS were involuntarily terminated, and mother had failed to rectify the conditions that led to that earlier termination of parental rights, i.e., her substance abuse issues. See MCL 712A.19a(2)(c); *Sanborn*, 337 Mich App at 260.

Contrary to mother's argument, the trial court made clear and detailed findings supporting termination at initial disposition[9] and that additional reasonable efforts were not required pursuant to MCL 712A.19a(2)(c), and, in light of these findings, the trial court was not required to make a finding of aggravated circumstances pursuant to MCL 712A.19a(2)(a).[10] See *Sanborn*, 337 Mich App at 260. Because the trial court appropriately found that reasonable efforts were not required pursuant to MCL 712A.19a(2)(c), mother's argument that DHHS failed to make reasonable efforts is meritless. See *id.*; *In re Rippy*, 330 Mich App 350, 358-359; 948 NW2d 131 (2019).

## C. STATUTORY GROUNDS FOR TERMINATION

As previously mentioned, to terminate mother's parental rights at initial disposition, the trial court was required to find that at least one statutory ground for termination under MCL 712A.192b(3) was proven by clear and convincing, legally admissible evidence. MCR 3.977(E)(3). MCL 712A.19b(3)(b)(*i*) states, in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

---

[9] There were six hearings in this case before the first disposition-termination hearing on June 28, 2023. At the first two hearings held on January 12 and January 31, 2023, aggravated circumstances due to the prior termination were identified and discussed. Mother entered her plea of no contest to the petition for jurisdiction at the June 1, 2023 adjudication. Apparently, adjournment requests were granted while mother sought inpatient substance abuse treatment.

[10] The trial court acknowledged on the record that it was not required to make a finding of aggravated circumstances but it nonetheless found that aggravated circumstances existed pursuant to MCL 712A.19a(2) and MCL 722.638(1)(b)(*i*) "due to the prior termination" and mother's failure to rectify the condition that led to that termination, "i.e., the substance abuse issue."

> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.[11]

Under MCL 712A.19b(3)(j), "[t]he harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm." *In re Sanborn*, 337 Mich App at 279. "Only one statutory ground need be established by clear and convincing evidence to terminate a mother's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

The evidence presented to the trial court adequately supported the trial court's finding that both MCL 712A.19b(3)(b)(*i*) and (j) had been proven by clear and convincing, legally admissible evidence. The evidence indicates that mother's parental rights to LS's sibling were terminated in 2013 as a result of physical abuse, substance abuse, and failure to complete court-ordered services to rectify the issues. The evidence also revealed that mother failed to rectify her substance abuse at the time of the initial dispositional hearing, and substance abuse was an ongoing and unrectified issue throughout her previous termination case. The trial court concluded that the evidence and testimony supported termination pursuant to subdivision (j) because mother's continued substance abuse, unemployment, and unstable housing created a reasonable likelihood that LS would be harmed if returned to mother's care. We agree. Given the clear pervasiveness of mother's substance abuse issues, the trial court did not clearly err by finding that subdivision (j) was established by clear and convincing, legally admissible evidence. See MCR 3.977(E)(3).

The testimony revealed that during parenting time, mother did her best to positively interact with LS, and grandmother also stated that mother could care for LS without assistance, but this occurred while mother and LS were living with the grandmother. The director of Bear River House also testified that mother interacted positively with LS during virtual parenting time visits, even though she believed it is difficult to engage a three-year-old via Zoom. Nevertheless, there were large spans of time when mother had no contact with LS, which negatively impacts a parent's bond with a young child.

Mother's substance abuse remained an issue that placed LS at risk of harm, and there is no dispute that mother went in and out of rehabilitation facilities several times during the pendency of this case (as well as over the past 13 years) without managing to maintain sobriety. In finding that termination under MCL 712.19b(3)(j) was proper, the trial court considered the fact that mother successfully completed a rehabilitation treatment program at Meridian where she received an early COVID release in February 2023. However, mother only stayed one week at Sacred

---

[11] MCL 712A.19b(3)(j) was recently amended, 2023 PA 295, effective February 13, 2024, to replace "he or she" with "the child."

-10-

Heart, which was a 90-day detox program. She also tested for very high levels of fentanyl on March 23, 2023, which indicated it was not her first time using fentanyl. Mother additionally had no prescription for fentanyl. Mother completed her program at Bear River House in June 2023, after the petition to terminate her parental rights had been filed, but she then entered Rise Sober Living on June 5, 2023, and was out of the program by June 26, 2023, due to alleged substance use.[12] While the court recognized that mother was still trying to get sober on her own after the petition was filed, it found that mother had been unable to maintain her sobriety whether in treatment, in a step-down sober living program, or over the course of years. The court focused on evidence from DHHS that mother had been asked to leave Rise Sober Living because it was purportedly discovered that she used some unidentified substance, but there was no testimony or evidence that mother entered another treatment facility after she left Rise. Notably, because mother failed to submit to drug testing or sign releases, there was no evidence of what the substance was and no drug test results were admitted in to the record.[13]

While mother was apparently capable of achieving sobriety, the evidence established that she was not committed to maintaining sobriety. Mother's longstanding substance abuse issues prevented her from providing LS with a safe, stable, non-neglectful home environment, as evidenced by the video that Mr. Shoup viewed of mother injecting herself with what he surmised was heroin while in LS's presence and falling asleep. Mother's extended lack of contact with BS and her sleeping rather than interacting with BS when they did have parenting time also spoke to the severity of mother's substance use issues, which placed LS at further risk of harm. Richard and Ms. Harrison testified about mother's overdoses and the 911 calls to her house between June and September 2022 as a result, as well as before LS was born. The trial court reviewed the evidence and the petition requesting termination at the initial adjudication and found that mother had received services to address her substance abuse issues for approximately 13 years. While she completed services and had an opportunity to demonstrate that she *benefited* from these services, she was unable to do so. When asked whether the court should give mother more time, Ms. Harrison was clear that 60 more days of sobriety was not enough to show that mother could keep LS safe, given her significant history of substance abuse. Accordingly, giving due regard for the trial court's ability to observe the witnesses, we do not have a definite and firm conviction that the trial court erred in finding that statutory grounds exist to terminate mother's parental rights to LS.

## D. BEST INTERESTS

As previously stated, the trial court was required to find that termination of mother's parental rights was in LS's best interests at the initial disposition. MCR 3.977(E)(4). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance

---

[12] Ms. Gravis testified that Marne Westfall at Recovery Pathways helped mother not only get into Sacred Heart and Bear River, but also with housing when mother received an eviction notice. Ms. Gravis had no information regarding mother's housing in June or July 2023.

[13] Notably, mother refused to sign releases for some of her treatment providers to give information regarding drug screens and treatment goals to Ms. Gravis; even Ms. Beals, who was subpoenaed from Odyssey House, failed to respond to her subpoena to testify. Accordingly, the court was left with less than complete information regarding mother's ongoing substance use test results.

of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). In making its determination, the court may consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *White*, 303 Mich App at 713-714. "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id.*

Mother principally argues that the trial court failed to consider her bond with LS. However, the trial court explicitly found that there was a very weak bond between her and LS because LS did not engage with mother during parenting time, did not ask or talk about mother after mother stopped attending parenting times, and no longer "had a reaction to not seeing her mother." Regardless, the trial court should consider a wide variety of factors and weigh *all* of the available evidence. *Id.* Mother had battled substance abuse for over a decade, continued to abuse substances despite attending a multitude of rehabilitation programs and being provided with services by DHHS, and did not have stable housing or employment. Mr. Shoup, BS's father, saw a video of mother using heroin while LS was present approximately six months prior to the initial dispositional hearing, and mother tested positive for very high levels of fentanyl less than three months prior to the hearing. Although mother completed a rehabilitation program on June 5, 2023, she was discharged from a sober living facility two days prior to the initial dispositional hearing for abusing substances again. In contrast, LS had a very strong bond with her uncle and his family, was thriving in her foster home, and reported that she enjoyed living with her Uncle Richard. Richard had provided LS with a safe, stable, and drug-free environment to live in, and he wanted to adopt LS.

Mother argues that LS's relative placement weighed against termination. "[T]he fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests," and relative placement typically weighs against termination. *Olive/Metts Minors*, 297 Mich App at 43. The trial court explicitly considered relative placement when it made its findings. The court found that the relative placement was meeting all of LS's needs. LS was "very bonded" to her relative caregiver and was doing "fantastic" in a "safe and stable home." The trial court also found that Richard's concern for LS's safety if she remained in mother's care, given mother's substance abuse and his preference for adoption "as opposed to any other permanent plan living arrangement[,]" weighed in favor of termination, despite the fact that he was a relative placement. The record evidence supports this finding, and we are not definitely and firmly convinced that the trial court clearly erred in its findings. See *id.* at 40.

Mother also argues that the trial court should have considered a guardianship in lieu of termination, that no less restrictive alternative to termination was ever considered, and that the trial court's failure to consider such alternatives violated her due-process rights. Ordinarily, "the appointment of a guardian is done in an effort to avoid termination of parental rights." *TK*, 306 Mich App at 705. "[F]or a court to consider a guardianship before termination, one of two

conditions must be met: either the DHHS must demonstrate 'under [MCL 712A.19a(8)] that initiating the termination of parental rights to the child is clearly not in the child's best interests' or the court must 'not order the agency to initiate termination' proceedings under MCL 712A.19a(8)." *Rippy*, 330 Mich App at 359, quoting MCL 712A.19a(9). See also *In re COH*, 495 Mich 184, 197; 848 NW2d 107 (2014). Even then, a trial court may order a guardianship only if it "determines that [doing so] is in the child's best interests[.]" MCL 712A.19a(9)(c). In this case, neither of the conditions under MCL 712A.19a(9) was met. DHHS did not demonstrate that termination was not in LS's best interests, and the trial court ordered DHHS to initiate the termination proceedings. There is also nothing in the record to indicate that a guardianship was requested or that a guardianship was in LS's best interests given her young age.

Additionally, contrary to mother's claims, there was some discussion regarding the possibility of alternatives to termination, and the trial court did not misconstrue any of the testimony regarding the matter. Richard testified that he had considered other long-term placement options, including alternatives to termination, but he preferred adoption to any other permanent placement option because he was very concerned for LS's safety given mother's substance abuse and past overdoses. The court expressly noted his preference for adoption and that he "was not looking for guardianship or anything else" because he was significantly concerned that mother was "going to end up dead" from substance abuse. And, as previously discussed, the trial court determined that termination was in LS's best interests. Given that the parties inquired about alternatives to termination, it necessarily follows that mother's due-process rights were not violated. See *In re B and J*, 279 Mich App 12, 19-20; 756 NW2d 234 (2008) (holding that a mother's due-process rights are violated if DHHS "deliberately takes action with the purpose of virtually assuring the creation of a ground for termination of parental rights, and then proceeds to seek termination on that very ground") (quotation marks, citations, and alterations omitted). Accordingly, mother's argument that the trial court should have established a guardianship for LS in lieu of termination is without merit.

Given mother's substance abuse issues and the prior termination of her parental rights to LS's sibling for the same issues, LS's young age and need for permanency and stability, the fact that LS was thriving in her relative foster placement, and the preference for adoption by Richard, LS's relative placement, the trial court did not clearly err by finding that it was in LS's best interests to terminate mother's parental rights. See MCR 3.977(E)(4).

Affirmed.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney

-13-